CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
November 09, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Alasia Fletcher, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00059 |
| | ) | |
| Eric Aldridge *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Alasia Fletcher, an inmate at a women's correctional facility in Virginia, brings this suit against prison officials for failing to protect her during and after she was allegedly raped and later physically assaulted by two other inmates. Fletcher claims that the officials violated her Eighth Amendment rights and were grossly negligent. The Defendants[1] argue that Fletcher fails to state a claim against them. This matter is before the court on the Defendants' motion to dismiss Fletcher's second amended complaint for failure to state a claim. (Dkt. 35.) For the reasons stated below, the court will grant the Defendants' motion in part and deny it in part.

[1] This motion is brought by all the Defendants except Defendant Demetria Barbour, who has answered the second amended complaint. (*See* Dkt. 35, Dkt. 38.)

# I. Background

## A. Factual History[2]

Plaintiff Alasia Fletcher is incarcerated at Fluvanna Correctional Center for Women ("FCCW"), located within the Western District of Virginia. (Second Am. Compl. ¶ 4 (Dkt. 32).) Initially upon her incarceration, Fletcher was affiliated with the Bloods gang. (*Id.* ¶ 24). She later decided to disassociate from the gang "to build a more prosocial life and avoid getting pulled into conflicts." (*Id.* ¶ 26). Following her disassociation, Fletcher has faced retaliation from gang members. She alleges deliberate indifference, failure to protect, and failure to train by FCCW officials and the FCCW warden in response to that retaliation, in violation of her Eighth Amendment rights. (*Id.* ¶¶ 93–132).

The facts Fletcher re-alleges in the second amended complaint are laid out in detail in the court's June 8, 2026 Memorandum Opinion addressing the Defendants' first motion to dismiss. (Dkt. 30). Thus, the court will not recount them all here but incorporates them by reference. Further factual recitation will focus on the additional allegations made by Fletcher in her second amended complaint.

1. <u>Allegations from before July 20, 2023</u>

Fletcher informed Defendant officials Clarissa C. Jackson, Janet Jamerson, and Valencia B. Hucks of her decision to disassociate from the Bloods "around 2018 or 2019." (Second Am. Compl. ¶ 27.) Though she had previously been interviewed by a Virginia

---

[2] The facts alleged in Fletcher's second amended complaint and supporting exhibits are accepted as true when evaluating whether the complaint states a claim upon which relief may be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009).

Department of Corrections ("VDOC") gang specialist multiple times a year, (*id.* ¶¶ 23–24), in 2019, the gang specialist stopped interviewing her, (*id.* at 30). Neither Jackson, Jamerson, nor Hucks instituted a "keep separate order" directing the separation of Fletcher from Bloods members following Fletcher's disclosure. (*Id.* ¶ 32.)

The same year, Fletcher was attacked by inmate Tyquesha Angina Hargrave ("Hargrave") and another inmate affiliated with the Bloods, resulting in injuries which required multiple days of hospital treatment ("the 2019 attack"). (*Id.* ¶ 33.) When Fletcher returned from the hospital, Hargrave threatened her, saying that "she would attack Fletcher again if Fletcher was moved back onto [her original unit]." (*Id.* ¶ 34.) Hargrave's threat was made in the presence of a non-Defendant official, "Turner," who transferred Fletcher to a different unit "for her safety."[3] (*Id.* ¶ 35.) However, Turner failed to institute a keep separate order requiring Fletcher's separation from Hargrave and other Bloods members, "document the need for continued separation," or elevate the matter to a higher authority within FCCW, in violation of relevant VDOC policy and procedures. (*Id.* ¶¶ 35–37.)

Fletcher alleged that for years leading up to each attack described, "[the] Defendants and other correctional officers at FCCW routinely fail[ed] to administratively charge or discipline inmates for violence despite Virginia DOC policies that require the same." (*Id.* ¶ 39.) Fletcher claims that Defendant Eric Aldridge, who is responsible for "the operation and maintenance of FCCW" as the facility's warden, (*id.* ¶ 7), "has been aware of dozens, if not

[3] Fletcher refers to Defendant Turner, who she claims witnessed this harassment. (*Id.* ¶ 34). However, the Defendants correctly point out that Fletcher has not named any Defendant Turner in her complaints. (Dkt. 36 at 10; *see generally* Dkts. 1, 9, 32.)

hundreds of instances of inmate attacks that are not appropriately documented," and that his and the other Defendants' failure to change this practice has created a "culture of impunity that emboldens attackers." (*Id.* ¶¶ 40–42.)

Months after the 2019 attack, Fletcher was once again placed in a housing unit with Hargrave and other Bloods members. (*Id.* ¶ 43.) While housed in the same unit, "Hargrave repeatedly stood outside Fletcher's cell and harassed" and threatened Fletcher, behavior which she reported to Defendants Jackson, Jamerson, and Hucks "repeatedly," "both orally and in writing." (*Id.* ¶ 46.) In 2021, Hargrave spat on Fletcher and another inmate ("the 2021 attack"). (*Id.* ¶ 47.) Both reported the assaults to Defendants Jackson, Jamerson, and Hucks. (*Id.*) "[The] Defendants again failed to appropriately document the violence and other abuse[] and failed to pursue administrative charges of discipline against Hargrave and the other members of the Bloods gang that were attacking Fletcher." (*Id.* ¶ 49.) Similarly, they did not institute a keep separate order but allowed Fletcher and Hargrave to continue to be housed on the same unit. (*Id.* ¶ 53.) Hargrave continued to harass Fletcher into 2022 and was then transferred to administrative segregation in 2022 after she assaulted another inmate. (*Id.* ¶¶ 55–56.)

On July 20, 2023, Fletcher was raped by two inmates at FCWW, Hargrave and Dakerie Jeanne Daniels. (*Id.* ¶¶ 58, 60.) The rape lasted over ten minutes, and Fletcher is now unable to have natural bowel movements as a result. (*Id.* ¶¶ 60–61.) The Defendants failed to intervene despite Fletcher's repeated cries for help. (*Id.* ¶ 63.)

According to Fletcher, the Defendants knew that she had been a target of "gang violence" before the rape, (*see* the 2019 attack and the 2021 attack), and that Hargrave and Daniels "had a history of working together to violently assault and otherwise terrorize inmates . . . ." (*Id.* ¶¶ 64–66.) As a result, Fletcher alleges that the Defendants "knew or should have known that [she] was at risk for violence at the hands of Hargrave and all other known members of the Bloods gang" even before she was raped. (*Id.* ¶ 67.) She alleges the Defendants, collectively, "failed to provide proper physical security," (*id.* ¶ 70)), "failed to provide adequate staff . . . and training," (*id.* ¶ 71), and "failed to administratively separate" perpetrators of gang violence, (*id.* ¶ 73), thus creating a "culture of complacency and condonation of violence . . . ," (*id.* ¶ 74).

2. Allegations from between July 20, 2023 and September 24, 2023

The court will not address Fletcher's allegations regarding Defendant Barbour's response to her report of rape, since they were already addressed in the June 8, 2026 memorandum opinion denying Barbour's motion to dismiss. (*See generally* Dkt. 30.) Outside of those made against Defendant Barbour, Fletcher does not make specific allegations from the time period between July 20, 2023 and September 24, 2023.

3. Allegations from after September 24, 2023

Though Fletcher reported the rape to Defendant Barbour, Fletcher continued to be housed on the same unit as Hargrave and Daniels. (*Id.* ¶ 78.) Consequently, Hargrave and Daniels had access to Fletcher on September 24, 2023, when they broke her hand in two places ("the 2023 attack"). (*Id.*) Fletcher submitted an emergency grievance seeking treatment for

her broken hand, but she was not taken to the emergency room until approximately 20 hours later. (*Id.* ¶ 90.)

Upon returning from the hospital, Fletcher again reported the rape and the 2023 attack, this time to Defendants Virginia Woodson and Jackson, on September 26, 2023. (*Id.* ¶¶ 78–80.) The same day, Hargrave and Daniels were placed in administrative segregation. (*Id.* ¶ 81.) However, both were released sixteen days later, even though neither Fletcher nor the witnesses she named in her complaint had been interviewed. (*Id.* ¶¶ 81, 85.) Defendant Jackson later approved an order keeping Fletcher separate from Hargrave and Daniels. (*Id.* ¶ 95.)

Yet Fletcher continued to encounter Hargrave and Daniels within FCCW. She repeatedly filed grievances detailing retaliation, attempted retaliation, and close encounters with them. (*See, e.g.*, *id.* ¶¶ 94, 99, 100, 105, 107, 108, 110, 111, 112, 113.) The recipients of these complaints included Defendants Jackson, Hucks, Andre Thomas, Tameka Elliott, Jamerson, and Aldridge. (*See id.* ¶¶ 94, 99–130.) Specifically, Fletcher noted that she saw Hargrave in the same building as her multiple times, (*id.* ¶ 99, 115, 122, 124); she repeatedly saw and was verbally berated by Hargrave or Daniels while outside, (*id.* ¶¶ 99, 103, 107, 119); she heard that Hargrave snuck out of her assigned building, (*id.* ¶¶ 110, 118); she encountered Daniels at her work assignment, (*id.* ¶¶ 111, 121); Hargrave threatened her through another inmate, (*id.* ¶ 112); Hargrave attempted to spit on her, (*id.* ¶ 113); and Hargrave kicked her in the shin and tripped her (*id.* ¶ 124). Fletcher alleged that though Hargrave and Daniels were housed in a separate building from her, they threatened her from common areas like the boulevard and the kitchen, (*see, e.g.*, *id.* ¶¶ 99, 103, 111), and she was called by FCCW staff to

buildings where Hargrave and Daniels were, despite the "keep separate" order, (*see, e.g.*, *id.* ¶¶ 99, 100).

The officials receiving these complaints consistently denied them, (*see, e.g.*, *id.* ¶ 110), found them "indeterminable," (*see, e.g.*, *id.* ¶ 115), or stated that the incident would be "looked into," apparently without taking further action, (*see, e.g.*, *id.* ¶ 112). Despite VDOC policy to the contrary,[4] officials repeatedly asserted that separation of the inmates' housing was sufficient to comply with their obligations under the keep separate order and that accidental meetings outside the housing block could not be controlled. (*See, e.g.*, *id.* ¶¶ 103, 120.)

### B. Procedural History

After the court's opinion on June 8, 2026 granting in part and denying in part the Defendants' prior motion to dismiss, (Dkt. 30), Fletcher filed her second amended complaint on June 29, 2026. (Dkt. 32.) All Defendants except Barbour moved to dismiss, (Dkt. 35), on August 8, 2026. Fletcher responded in opposition on August 31, 2026. (Dkt. 45.) Defendant Barbour answered Fletcher's second amended complaint on August 12, 2026. (Dkt. 38.)[5]

## II. Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys.,*

[4] *See* Second Am. Compl. ¶ 129; Dkt. 32-6 at 6.

[5] The Officials make some arguments on Barbour's behalf in their motion to dismiss. (*See* Dkt. 36 at 8 n.3). However, Barbour is not a proponent of this filing. Accordingly, the court will not consider arguments the other Defendants assert on Barbour's behalf. Any defenses to Fletcher's claims against Barbour will be addressed in accordance with Barbour's answer to the second amended complaint, (Dkt. 38).

*LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616.

## III. Analysis

Fletcher alleges three counts against various Defendants under federal law. In Count I, Fletcher alleges that Defendants Barbour, Jackson, Hucks, Thomas, Elliott, Woodson, and Jamerson ("the Officials") violated the Eighth Amendment by failing to protect her from Hargrave and Daniels. (Second Am. Compl. ¶¶ 133–167.) In Counts II and III, Fletcher alleges that Defendant Aldridge violated the Eighth Amendment by failing to protect her from Hargrave and Daniels and by failing to adequately train the FCCW staff. (*Id.* ¶¶ 168–228.)

Fletcher brings her claims against all Defendants both in their official and individual capacities. (Second Am. Compl. ¶ 14.) As stated in the court's June 8, 2026 memorandum opinion,

> "[A] suit against a state official in his or her official capacity . . . is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). It is well established that "§ 1983 suits by individuals against a state for money damages are barred by the state sovereign immunity embodied in the

> Eleventh Amendment." *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 749 (D. Md. 2023). Any state law claim brought against the Defendants in their official capacity, regardless of the relief sought, is likewise barred by the Eleventh Amendment. *See Harker v. State Use Indus.*, 990 F.2d 131, 132 n.1 (4th Cir. 1993).
>
> Fletcher alleges that all Defendants, at all relevant times, were employees of the Virginia Department of Corrections ("VDOC"). [(Second Am. Compl. ¶¶ 7–13.)] VDOC is an executive agency of the Commonwealth of Virginia. *See* Va. Code. Ann. § 53.1-8. All Defendants, then, were employees of the Commonwealth of Virginia at the relevant times, and Fletcher's § 1983 claims and state law claims for compensatory and punitive damages against them in their official capacities cannot lie.

(Dkt. 30 at 7.) The court will proceed to analyze her claims against the Defendants in their individual capacities.

**A. § 1983 Claims Against the Officials (Count I)**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII. This prohibition imposes certain duties on prison officials. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Among these is the duty to protect inmates from violence at the hands of other inmates. *Id.* at 833. But "not every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834).

To state an Eighth Amendment claim for failure to protect, an inmate must allege facts sufficient to satisfy two elements, one objective and one subjective. *King v. Riley*, 76 F.4th 259, 264 (4th Cir. 2023); *Gomez v. Davis*, 7:20-cv-00726, 2022 WL 777064, at *4 (W.D. Va. Mar. 11, 2022). First, an inmate must have suffered a "serious deprivation of [her] rights in the form

of a 'serious or significant physical or emotional injury.'" *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014) (quoting *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010)).

Second, the prison official must have had a "sufficiently culpable state of mind," which, in this context, is one of "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (cleaned up). Deliberate indifference is a "demanding standard*," Mullen v. Town of Sunset Beach, N.C.*, 175 F.4th 466, 472 (4th Cir. 2026), which requires the prison official to "know[] of and disregard[] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Accordingly, an official's "failure to alleviate a significant risk that he should have perceived but did not" cannot form the basis of an Eighth Amendment claim. *Id.* at 838.

Fletcher alleges that the Officials "had actual knowledge that Hargrave and Daniels posed a substantial risk of serious harm to Fletcher," that they were deliberately indifferent to this risk to Fletcher's safety in violation of the Eighth Amendment, and that this indifference resulted in actual harm to Fletcher. (Second Am. Compl. ¶¶ 139, 155–57.)

1. <u>Before July 20, 2023</u>

    *i. All Officials: objective prong*

On July 20, 2023, Fletcher was raped by Hargrave and Daniels. (*Id.* ¶ 58.) At this stage, the Defendants do not contest that the rape constitutes a "serious or significant physical or emotional injury" satisfying the "serious deprivation" prong of the failure to protect analysis. (*See* Defs.' Br. at 8–31 (arguing only that Fletcher fails to meet the subjective prong of the

analysis) (Dkt. 36); Dkt. 30 at 10.) Fletcher thus satisfies the objective element of her failure to protect claim. Accordingly, Fletcher's claim of deliberate indifference regarding the rape depends on whether the Defendants had a "sufficiently culpable state of mind" in the period leading up to the rape. *Farmer*, 511 U.S. at 834 (cleaned up).

*ii. Defendants Jackson, Jamerson, and Hucks: subjective prong*

Under the deliberate indifference standard, a defendant-official need not have "acted or failed to act believing that harm actually would befall an inmate;" nor have intended that such harm befall the inmate. *Id.* at 842. Rather, the official must have "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* While Fletcher must allege that the Defendants had actual knowledge—not merely that they should have known about the serious risk to her—that knowledge can be inferred from the circumstances, such as when the risk is "obvious." *Id.* For instance, "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," combined with "circumstances [that] suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it" can support a finding that the defendant-official possessed actual knowledge of the risk. *Id.* at 842–43 (internal quotations omitted).

In her prior complaint, Fletcher failed to allege "that she or another inmate had ever told any of the Officials about prior gang violence or Hargrave and Daniels's history or that any of them had ever previously acknowledged such." (Dkt. 30 at 9 (internal quotations omitted).) *Cf. Raynor v. Pugh*, 817 F.3d 123, 129 (4th Cir. 2016) (finding sufficient for

establishing deliberate indifference an allegation that an inmate told the defendant official that he was going to attack the plaintiff). In her second amended complaint, Fletcher was more specific about Jackson's, Jamerson's, and Hucks' knowledge. Fletcher alleges that Defendants Jackson, Jamerson, and Hucks were informed that she had disassociated from the Bloods, of which Hargrave and Daniels remained members,[6] before the rape, (Second Am. Compl. ¶¶ 27, 28, 33); that her assailants repeatedly threatened and harassed her by her cell, (*id.* ¶ 46); and that Hargrave spat on Fletcher and another inmate, (*id.* ¶ 47).

Taking the facts in the light most favorable to Fletcher, the risk of retaliation from Bloods members after Fletcher's disassociation is plausibly "so obvious that it had to have been known." *Makdessi*, 789 F.3d at 129. Because they were specifically informed of her disassociation, Jackson, Jamerson, and Hucks can be deemed to have had knowledge that Fletcher was at some risk for retaliation. And they need not have known exactly who would go on to attack her. *Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."). Further, Jackson, Jamerson, and Hucks were aware that Fletcher faced repeated harassment from Hargrave and Daniels

[6] The Defendants argue that Fletcher provides "no specifics" as to how FCCW officials knew that Hargrave and Daniels were members of the Bloods. (Defs.' Br. at 9.) This is immaterial. Fletcher's reports to Defendants Jackson, Jamerson, and Hucks that she had disassociated from the Bloods were plausibly enough to identify her as a target of potential gang violence, and the officers did not need to know specifically which other inmates would go onto assault her. *See Farmer*, 511 U.S. at 843. Thus, even if the officers did not know that Hargrave and Daniels were Bloods members who would target Fletcher they plausibly knew that members of the Bloods would seek retaliation against her.

such as name-calling, threatening violence and spitting on her. (Second Am. Compl. ¶¶ 46, 47.)

But prior to her report of the rape, Fletcher does not allege any factual circumstances that would make it plausible that the Defendants actually knew she was at risk of a serious deprivation of her rights. To prove deliberate indifference, Fletcher must allege that the prison official "kn[ew] of and disregard[ed] an *excessive* risk to inmate health or safety." *Farmer*, 511 U.S. at 837 (emphasis added). The incidents that Fletcher alleges these Defendants knew about are different in kind from the rape and broken hand Fletcher would go on to suffer. Though Fletcher alleges that a 2019 attack by Hargrave landed her in the hospital, (Second Am. Compl. ¶¶ 28, 33), she does not allege that Jackson, Jamerson, or Hucks knew of this incident. (Defs.' Br. at 10); *see also Battle v. S.C. Dep't of Corr.*, No. 9:19-cv-1739, 2021 WL 4167509, at *3, *11 (D.S.C. Sept. 14, 2021) (concluding that the defendant-correctional officers lacked the subjective knowledge needed for deliberate indifference, despite the existence of a report detailing problems at the relevant facility and even though that knowledge might fairly have been imputed to a warden who was responsible for managing the facility).

The only indication in Fletcher's second amended complaint that Defendants Jackson, Jamerson, and Hucks knew about this incident is Fletcher's assertion that "all Defendants had knowledge of Hargrave's brutal attack on Fletcher that resulted in her hospitalization." (Second Am. Compl. ¶ 38.) Simply alleging that all Defendants had knowledge of the 2019 attack does not provide sufficient factual detail from which the court can infer that Defendants Jackson, Jamerson, and Hucks had actual knowledge of the incident. *See Nanni v. Aberdeen*

*Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) ("[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of that which is alleged." (citation omitted)). The court is mindful that, "at this early stage in the litigation, a plaintiff will not come to court fully armed with the requisite facts to prove their case." *Langford v. Joyner*, 62 F.4th 122, 126 (4th Cir. 2023). Accordingly, it does not demand "detailed factual allegations." *Id.* (citation omitted). "But [it] do[es] require sufficient facts to allow the court to infer liability as to each defendant." *Id.* (citation omitted). With no factual details showing how these specific Defendants would know of the 2019 attack, these conclusory statements are insufficient to suggest the Officials' knowledge of the risk to Fletcher before she was raped. *Cf. Raynor v. Pugh*, 817 F.3d 123, 129 (4th Cir. 2016) (finding sufficient for establishing deliberate indifference an allegation that an inmate told the defendant official that he was going to attack the plaintiff).

The details that Fletcher does offer as far as these Defendants' knowledge are insufficient. Fletcher emphasizes the fact that "investigators at FCCW held a mediation between Hargrave and Fletcher" at the end of 2021, and that Defendants Jackson, Jamerson, and Hucks were present. (Second Am. Compl. ¶ 51.) But these Defendants' presence at the mediation alone, even when viewed in the light most favorable to Fletcher, does not support the inference that these Defendants knew of the 2019 attack. Fletcher's response brief somewhat clarifies the connection she alleges. Fletcher says in the brief that "[she] and other

inmates reported prior gang violence to Defendants Jackson, Jamerson, and Hucks, and that history was acknowledged in the unsuccessful mediation." (Pl.'s Resp. at 16 (Dkt. 45).)

But this is a new factual allegation asserted for the first time in Plaintiff's response brief. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013). Thus, the court cannot consider this as part of its 12(b)(6) analysis. Without additional factual allegations regarding context for this mediation, Fletcher's conclusions that these Defendant Officials knew about the 2019 attack are unsupported.

Though they may have known about Hargrave's and Daniels' verbal threats, harassment, and spitting, these incidents do not demonstrate that these Defendants knew, before July 20, 2023, that Fletcher faced "an excessive risk" to her health or safety. *Farmer*, 511 U.S. at 837; *see also Al-Haqq v. Lucas,* No. 2:24-cv-03960, 2026 WL 717989, at *11 (D.S.C. Jan. 28, 2026), *adopted by* No. 2:24-cv-03960, 2026 WL 716807 (D.S.C. Mar. 13, 2026) (explaining that "subjective awareness of only *some* risk of harm to a prisoner is insufficient," and instead, a plaintiff must show the defendant-official knew enough to conclude that the threat presented a "strong likelihood of injury, not a mere possibility" (cleaned up)).

Fletcher alleges, based on information and belief, that "many other inmates have filed PREA complaints" against both Hargrave and Daniels. (Second Am. Compl. ¶¶ 57, 59.) Even assuming, *arguendo*, that PREA complaints against Hargrave and Daniels would demonstrate that they posed an excessive risk to inmate safety, Fletcher does not allege that Jackson, Jamerson, or Hucks ever received such a grievance. Thus, the court cannot conclude that

Jackson, Jamerson, and Hucks actually "dr[ew] the inference" that Fletcher faced an excessive risk. *Farmer*, 511 U.S. at 837. Making that connection would require these particular Defendant Officials to know 1) that Hargrave and Daniels had been reported for PREA violations and 2) that Hargrave and Daniels had targeted Fletcher for retaliation. Making all reasonable inferences in favor of Fletcher, she only alleges the second half of this logical chain.

Next, "the mere fact that officials knew of an inmate's history of violence and past threats to harm others is not dispositive on the issue of deliberate indifference." *Malvo v. Clarke*, No. 7:23-cv-00535, 2025 WL 2656282, at *5 (W.D. Va. Sept. 16, 2025). Though Fletcher is not required to have given Jackson, Jamerson, and Hucks "advance notice" of the threat she faced, *Farmer*, 511 U.S. at 848, she must allege direct or circumstantial evidence that the officers were aware of an excessive risk to her health or safety. *See id.* at 837, 842, 848. Knowledge that Hargrave and Daniels had "a history of violence or had made threats" is not sufficient to allege deliberate indifference unless "'the Defendants subjectively believed the assailant inmate[s] posed a substantial risk of serious harm . . . .'" *Malvo*, 2025 WL 2656282, at *5 (quoting *Strickland v. Halsey*, 638 F. App'x 179, 185–86 (4th Cir. 2015) (cleaned up)); *see Strickland*, 638 F. App'x at 186 (concluding there was no deliberate indifference in a prison murder case, despite a twice-convicted murderer's stated threats to kill again, because the defendant-officers did not believe he was capable of carrying out the threats); *Battle*, 2021 WL 4167509, at *10 ("[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." (citation omitted).)

As a result, Fletcher has only plausibly alleged that Defendants Jackson, Jamerson, and Hucks had knowledge that Fletcher was at risk, generally, for some form of gang retaliation. The retaliatory incidents they knew of did not rise to the level of an "excessive risk" to Fletcher's health or safety. *Farmer*, 511 U.S. at 837. Because Fletcher does not plausibly allege that Jackson, Jamerson, or Hucks had actual knowledge that she faced a substantial risk of serious harm before July 20, 2023, Fletcher does not state a claim against them for this time period.

*iii. Defendants Thomas, Elliott, and Woodson*

Fletcher does not make any individualized allegations against Defendants Thomas, Elliott, or Woodson during the time period before July 20, 2023. As in her first amended complaint, (Dkt. 9), Fletcher alleges that all Defendants, as a collective, knew she had been a target of "gang violence"; knew Hargrave and Daniels worked together to assault inmates; and thus "knew or should have known that [she] was at risk for violence at the hands of Hargrave and all other known members of the Bloods gang" before she was raped. (Second Am. Compl. ¶¶ 64–67.)

> But with no further details supporting these factual allegations, these conclusory statements are insufficient to suggest [Thomas', Elliott's, or Woodson's] knowledge of the risk. Fletcher never alleges, for example, that she or another inmate had ever told [them] about prior "gang violence" or Hargrave and Daniels's "history" or that any of them had ever previously acknowledged such. *Cf. Raynor v. Pugh*, 817 F.3d 123, 129 (4th Cir. 2016) (finding sufficient for establishing deliberate indifference an allegation that an inmate told the defendant official that he was going to attack the plaintiff). Accordingly, Fletcher does not sufficiently allege that [Thomas, Elliott, or Woodson] "kn[ew] of and disregard[ed] an excessive risk to [her] health or safety" before July 20, 2023. *Farmer*, 511 U.S. at 837.

(Dkt. 30 at 9).

Because Fletcher only makes the allegations described against "Defendants" as a collective, and she does not make specific allegations against Defendants Thomas, Elliott, or Woodson, Fletcher does not plausibly state a claim that they were deliberately indifferent in failing to protect her from rape.

*iv. All officials: subjective prong*

Fletcher alleges that the rape was "a prolonged assault lasting at least ten (10) minutes," during which she "screamed in pain and terror and begged for help at the top of her lungs." (Second Am. Compl. ¶¶ 61–63; Pl.'s Reply at 14.) Nonetheless, "Defendants failed to intervene and stop the assault." (*Id.* ¶ 63.) Courts in this circuit have held that "completely failing to take any action to stop an ongoing assault on a prisoner can amount to deliberate indifference." *Milan v. S.C. Dep't of Corr.*, No. 1:17-cv-02692, 2020 WL 4588973, at *24 (D.S.C. Feb. 28, 2020), *adopted by* No. 1:17-CV-02692, 2020 WL 2487496 (D.S.C. May 13, 2020) (citation omitted); *see also Ward v. Blackwell*, No. 4:17-cv-0367, 2018 WL 3133364, at *6 (D.S.C. Feb. 6, 2018), *adopted by* 2018 WL 2244621 (D.S.C. May 16, 2018), *reconsideration denied sub nom. Ward v. Kicinski*, 2018 WL 3389987 (D.S.C. July 12, 2018) ("An unreasonable delay in intervening in a fight between prisoners can amount to deliberate indifference.").

But Fletcher does not allege that any of these Defendant Officials, specifically, were on duty and could have heard or seen the attack or otherwise known to intervene. Because she does not allege factual details about how each Defendant personally acted in violation of her rights relating to their failure to intervene during the rape, she does not state a claim based on this failure to intervene. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017).

2. Between July 20, 2023 and September 24, 2023

*i. All Officials: objective prong*

On September 24, 2023, Fletcher's hand was broken in two places by Hargrave and Daniels. (Dkt. 32 ¶ 87.) At this stage, the Defendants do not contest that Fletcher's broken hand constitutes a "serious or significant physical or emotional injury" satisfying the "serious deprivation" prong of the failure to protect analysis. (*See* Defs.' Br. at 8–31 (arguing only that Fletcher fails to meet the subjective prong of the analysis) (Dkt. 36); Dkt. 30 at 10 .) Fletcher thus satisfies the objective element of her failure to protect claim. Accordingly, Fletcher's claim of deliberate indifference regarding the rape depends on whether the Defendants had a "sufficiently culpable state of mind" in the period leading up to the hand break. *Farmer*, 511 U.S. at 834 (cleaned up).

*ii. Defendant Barbour: subjective prong*

The court has addressed Fletcher's claims regarding Barbour's behavior during this period in its prior memorandum opinion, and it incorporates that discussion by reference. (*See* Dkt. 30 at 10–12.)

*iii. Other Officials: subjective prong*

As in her first amended complaint, Fletcher does not allege that she reported the rape to any officials other than Barbour before September 24, 2023, when her hand was broken.[7] That said, "the failure to give advance notice is not dispositive." *Farmer*, 511 U.S. at 848. "Petitioner may establish respondents' awareness [of threats to her health or safety] by

[7] Similarly, Fletcher does not allege that Barbour told anyone else of the rape she reported. (*See* Second Am. Compl. ¶ 77.)

reliance on any relevant evidence." *Id.* Thus, to plausibly allege that the Defendants other than Barbour knew of an "excessive risk to [Fletcher's] health or safety" before her hand was broken, Fletcher must allege some facts describing circumstances that show or suggest Defendants' actual knowledge. *Id.* at 837, 848. As with the pre-July 20 time period, however,

> Fletcher does not allege any facts to suggest that those specific Officials were aware of the alleged rape or of any risk to Fletcher's safety from Hargrave and Daniels before September 24, 2023. As explained above, Fletcher only alleges conclusory statements as to the Officials' knowledge of any risk before the alleged rape. And Fletcher does not allege that she told anyone else besides Barbour about the rape between July 20, 2023, and September 24, 2023. Accordingly, Fletcher does not sufficiently allege that the other Officials actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety" before September 24, 2023. *Farmer*, 511 U.S. at 837.

(Dkt. 30 at 12.)

Because Fletcher does not make specific allegations against any of the Defendant Officials other than Barbour, nor does she allege any facts that would suggest that these particular Officials were aware of the rape during this period, Fletcher does not plausibly state a claim that they were deliberately indifferent in failing to protect her from the hand break.

3. <u>After September 24, 2023</u>

Fletcher alleges that after she reported the rape and broken hand to the Officials, they failed to sufficiently protect her from retaliation by Hargrave and Daniels. (Second Am. Compl. ¶ 94.) To state a claim against any of the Officials, Fletcher must sufficiently allege that each of them, through their *own individual actions*, has violated the Constitution. *King*, 76 F.4th at 269 (quoting *Iqbal*, 556 U.S. at 677) (emphasis added). That is, Fletcher needs to allege

factual details about how each Defendant personally acted in violation of her rights. *Wilcox*, 877 F.3d at 170.

*i. All officials: objective prong*

To state a deliberate indifference claim, Fletcher must allege she suffered a "serious deprivation of [her] rights in the form of a 'serious or significant physical or emotional injury.'" *Danser*, 772 F.3d at 346 (4th Cir. 2014) (quoting *Brown*, 612 F.3d at 723). After September 24, Fletcher alleges that she saw Hargrave in the same building as her multiple times, (Second Am. Compl. ¶ 99, 115, 122, 124); she repeatedly saw and was verbally berated by Hargrave or Daniels while outside, (*id.* ¶¶ 99, 103, 107, 119); she heard that Hargrave snuck out of her assigned building, (*id.* ¶¶ 110, 118); she encountered Daniels at her work assignment, (*id.* ¶¶ 111, 121); Hargrave threatened her through another inmate, (*id.* ¶ 112); Hargrave attempted to spit on her, (*id.* ¶ 113); and Hargrave kicked her in the shin and tripped her, (*id.* ¶ 124). These interactions with Hargrave and Daniels resulted in "continued physical and mental pain and suffering for Fletcher," who was frequently "remind[ed] of the horror of the night" she was raped. (*Id.* ¶¶ 111, 115, 120, 122, 127–29, 132.) "Hargrave's unmonitored movements around the facility . . . trigger[ed] intense PTSD from Fletcher," (*id.* ¶ 110), as well as nightmares which kept her from sleeping, (Dkt. 32-7 at 4; Dkt. 32-8 at 14).

The mental anguish directly stemming from the rape itself is not attributable to Defendants' conduct after September 24. However, recurring mental anguish, which is rooted in the rape and the hand break,is caused by Defendants' later failures to effectively separate Fletcher from Hargrave and Daniels, appears to be a separate injury. Making all reasonable

inferences in favor of Fletcher, the physical assault she suffered when Hargrave kicked her, (Second Am. Compl ¶ 124), combined with the PTSD and severe trauma she suffers through repeated exposure to Hargrave and Daniels, (*id.* ¶¶ 110–11, 115, 120, 122, 127–29, 132), plausibly constitute serious emotional injury in the deliberate indifference context. *See Danser*, 772 F.3d at 346; *see also Doe v. Anne Arundel Cnty.*, No. 1:23-cv-03451, 2024 WL 2053719, at *2 (D. Md. May 8, 2024) (noting, in a ruling on a motion to proceed under a pseudonym, that "[t]he experience of sexual abuse can be deeply psychologically traumatic" and acknowledging that later experiences related to the initial abuse "can trigger new trauma even years after the fact") (citation omitted); *Guillot v. Castro*, No. CV 17-6117, 2018 WL 3475294, at *6 (E.D. La. July 19, 2018) (noting that "[c]ourts have held that mental health issues incurred as a result of sexual assault [are] sufficient to establish an injury").

*ii. All officials: subjective prong*

To state a claim for deliberate indifference, Fletcher must also allege that each prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The substance of Fletcher's allegations regarding the Defendant Officials' conduct during this period has not changed from her first amended complaint. In brief, Fletcher alleges that the Defendants failed to follow the Prison Rape Elimination Act, (Second Am. Compl. ¶ 94); failed to properly investigate her complaints and violated VDOC procedures, (*id.* ¶¶ 99–132); provided inadequate responses to written grievances, (*id.*); turned off a body-worn

camera during Fletcher's report of her rape and subsequent attack, (*id.* ¶ 79); and generally "did not sufficiently implement the [VDOC] Operating Procedure[s] and other relevant policies, procedures, and customs in place to protect Fletcher from retaliation by Hargrave and Daniels . . . ," (*id.* ¶ 94).

As explained in the court's June 8, 2026 opinion, none of the particularized claims that Fletcher makes are individually actionable. (Dkt. 30 at 13–17). The generalized allegations that the Defendant Officials "did not sufficiently implement the [VDOC] Operating Procedure[s] and other relevant policies, procedures, and customs in place to protect Fletcher from retaliation by Hargrave and Daniel" also fail to state a claim. (Second Am. Compl. ¶ 94; Dkt. 30 at 16.) In Fletcher's second amended complaint, however, she makes clear that she is not alleging "individual causes of action" with respect to PREA and VDOC policy violations or failures to investigate. (Pl.'s Resp. at 25–26.) "Rather, [these allegations] support a showing of deliberate indifference by demonstrating Defendants had notice, available protective mechanisms, and repeated opportunities to act but disregarded the same." (*Id.* at 26.)

Courts have allowed deliberate indifference claims to go forward based on an accumulation of actions which would not be individually actionable. *See Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) (noting that courts "ha[ve] concluded that a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention"); *Young v. Wexford Health Sources*, No. 10 C 8220, 2012 WL 621358, at *4–5 (N.D. Ill. Feb. 14, 2012) ("Though a prison official

has no substantive constitutional duty to respond to grievances, he or she does have a duty to prevent and remedy known constitutional violations within his supervision and control. A prison official may therefore be liable under 42 U.S.C. § 1983 for failing to respond to violations of a prisoner's constitutional rights that come to his or her attention via the grievance process.").

Still, to state a claim against any of the Defendant Officials, Fletcher must sufficiently allege that their individual actions violated the Constitution. *King*, 76 F.4th at 269. That is, Fletcher needs to allege factual details about how each Defendant personally acted in violation of her rights during the period after September 24, 2023. *Wilcox*, 877 F.3d at 170.

Fletcher alleges that she recounted the rape and broken hand to Jackson after returning from the hospital in September 2023. (Second Am. Compl. ¶ 79) Defendant Jackson then approved a keep separate order "[a]t some point after" Fletcher's rape and hand break. (*Id.* ¶ 95.) Operating Procedure 830.6, which explains the requirements for keep separate orders, commands that staff "always keep inmates approved for Keep Separate status separate" and that such inmates should "not [be] place[d] in the same institution except at Security Level 5 and Security Level S institutions where adequate security restrictions should prevent inmates from ever coming in contact except in a closely monitored area." (*Id.* ¶¶ 98, 129.)

Jackson knew during this period that Hargrave and Daniels had raped Fletcher and broken her hand. Though Jackson repeatedly received documented evidence of failures of the keep separate policy and the resultant injuries to Fletcher, she frequently responded to grievances by writing that the matter would be "looked into," without taking other action to

address Fletcher's concerns. (*See id.* ¶¶ 101, 103, 104, 111–13, 118–19, 123, 127, 128.) Accordingly, Fletcher has plausibly alleged that Jackson was deliberately indifferent to a known, serious risk of harm against her after September 24, 2023. *See Scott v. Clarke,* No. 3:12-cv-00036, 2012 WL 6151967, at *5 (W.D. Va. Dec. 11, 2012) ("The receipt of letters by prison officials may be evidence of personal knowledge of unconstitutional conditions, particularly where the harm continues over a period of time." (cleaned up)); *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 303 (W.D. Va. 2021) (noting that even if a defendant took some action, "[a] defendant's inadequate response . . . can still support a finding of deliberate indifference").

Fletcher alleges that she "reported her rape and subsequent physical assault" to Defendant Woodson on September 26, 2023. (Second Am. Compl. ¶ 79.) Fletcher believes that during this report, Woodson "turned off her body-worn camera." (*Id.*) As explained in the court's June 8, 2026 opinion, this is not an actionable offense. (Dkt. 30 at 15 (citing *Sims v. Mondul*, No. 7:25-cv-00349, 2026 WL 323835, at *4 n.5 (W.D. Va. Feb. 6, 2026) (explaining that even the purposeful deletion of video footage "is not actionable under § 1983")).) Otherwise, Fletcher acknowledges that Woodson "immediately walked Fletcher to the office of Defendant Jackson" so that she could again report her rape, (Second Am. Compl. ¶ 80), and that Hargrave and Daniels "were placed in administrative segregation . . . upon Fletcher's report of her rape . . . to defendants Jackson and Woodson," (*id.* ¶ 81). Fletcher's only other claim is that, despite the likelihood that "all DNA evidence would have been gone" by the time she reported these attacks to Woodson, "all available able physical and testimonial evidence should have been collected." (*Id.* ¶ 85.) While this failure to collect evidence may

constitute negligent behavior, "deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. Thus, Fletcher does not state a claim against Woodson for this period.

Fletcher alleges she addressed a single grievance to Defendants Elliott and Thomas, in which she reported that Hargrave and Daniels waited on the boulevard to "scream threats and embarrass" her. (Second Am. Compl. ¶ 99 (cleaned up).) An unspecified FCCW staff member responded asking Fletcher to "report to the officer" on duty if Hargrave and Daniels continued harassing her and noting that "[i]t will be addressed to enforce keep separate." (*Id.* (cleaned up).) Otherwise, Elliott only appears in Fletcher's general allegation that she "reported retaliation" to Defendant Officials, (*id.* ¶ 99), and in Defendant Aldridge's response to a grievance noting that the "Grievance Coordinator spoke with Major T. Elliot[t] and was informed that anytime Inmate Daniels is working with B & G there is staff present to ensure the safety of Inmate Fletcher," (*id.* ¶ 121). Fletcher's only other mention of Defendant Thomas is in a written complaint explaining how Thomas took actions to separate Fletcher from Hargrave when Fletcher reported seeing her. (*Id.* ¶ 119.) These statements do not suggest individual action by either Defendant Elliott or Defendant Thomas which violated Fletcher's Eighth Amendment rights. Thus, Fletcher does not state a claim against Elliott or Thomas for this period.

As in her first amended complaint, Fletcher does not allege any individual conduct by Hucks or Jamerson throughout the rest of the amended complaint. She only mentions that

she reported "[r]etaliation" to them. (Second Am. Compl. ¶ 94.) As explained in the court's June 8, 2026 opinion,

> Fletcher cannot state a deliberate indifference claim against these [two] Defendants relying solely on collective and general allegations. *See Rice v. Adams*, 172 F.4th 428, 432 (4th Cir. 2026) ("To allege that an officer acted with deliberate indifference, the complaint must make defendant-specific allegations."). Fletcher's allegations are not "particular enough to allow one to infer what each defendant did and knew." *Id.* Defendant-specific allegations are especially critical for Eighth Amendment claims because of the subjective element that the prison official must have acted with a "sufficiently culpable state of mind." *Price v. White*, No. 5:23-cv-00010, 2024 WL 209186, at *5 (W.D. Va. Jan. 19, 2024). "[B]oilerplate conclusion[s]—lacking defendant specificity and factual support—do[] not state claim." *King*, 76 F.4th at 269.

(Dkt. 30 at 16.) Fletcher thus does not state a claim under § 1983 Hucks or Jamerson for this time period. For these reasons, Fletcher's claims against Defendant Jackson for the post-September 24 period will proceed. But the court finds that Fletcher does not state a claim against Defendants Woodson, Elliott, Thomas, Hucks, or Jamerson for the post-September 24 period. Accordingly, the court will dismiss Count I against these Defendants.

### B. § 1983 Claims Against Aldridge (Counts II and III)

In Counts II and III, Fletcher alleges that Defendant Aldridge, the warden of FCWW, failed to "adequately staff, train, and supervise VDOC agents and employees at FCCW," (Second Am. Compl. ¶ 174), and to "ensure that all FCCW employees and/or agents compl[ied] with VDOC Operating Procedures," (*id.* ¶ 199), exposing Fetcher to "an unreasonable risk of sustaining severe injury," (*id.* ¶ 171), in violation of the Eighth Amendment. (*See* Second Am. Compl. ¶¶ 168–228.) Fletcher appears to claim that Aldridge is liable both directly and in his supervisory capacity.

1. Direct Liability

To establish direct liability for Fletcher's rape or broken hand, Fletcher must allege that Aldridge "kn[ew] of and disregard[ed] an excessive risk to [her] health or safety" before those injuries occurred. *Farmer*, 511 U.S. at 837.

*i. Before September 24, 2023*

The court addressed Fletcher's prior allegations regarding Aldridge's knowledge in its June 8, 2026 memorandum opinion. (Dkt. 30 at 17–20.) It incorporates its analysis, which remains applicable.

Fletcher adds to this complaint that Aldridge "knew that it was the custom and common practice of correctional officers at FCCW to fail to document and administratively charge or discipline inmates for instances of violence at the facility," (*id.* ¶ 179), and that he "knew or should have known for years" prior to the violence against Fletcher "that widespread and pervasive . . . failure to document and administratively charge inmates" for violence against other inmates "created a culture of impunity that emboldens aggressors . . . and increases the likelihood of repeated and more severe attacks," (*id.* ¶ 180).

These additions are conclusory. Fletcher does not provide any factual support for the allegation that Aldridge knew there was a "custom" of failing to document and charge inmates for violence prior to her rape and broken hand. (*Id.* ¶ 179). She does not point to any specific failures to charge or document violence outside of her own circumstances, (*see id.* ¶¶ 32, 36, 38, 43, 49, 53; *cf. id.* ¶ 39). Nor does she allege that Aldridge was aware of these failures to document or charge Hargrave and Daniels, nor does she point to any surrounding

circumstances that would let this court make an inference of such awareness. Indeed, Fletcher alleges that lower-level corrections officers failed to document and to charge inmates, including by "fail[ing] to refer known threats to Fletcher's safety to . . . [shift commanders] or any higher authority." (*Id.* ¶ 36.) Rather than pointing towards Aldridge's knowledge of a problem, these facts, without more, suggest that he would not have known of the risk Fletcher faced.[8]

More generally, Fletcher alleges that "[f]or years, Defendant Aldridge has been aware of dozens, if not hundreds of instances of inmate attacks that are not appropriately documented, and that do not result in administrative charges of discipline," but she does not provide any factual support for that assertion. (*Id.* ¶ 40.) Fletcher alleges that these failures occurred, and she alleges that, as warden, "Aldridge oversees the operation and maintenance of FCCW and is directly responsible for the safe, secure, and humane treatment of all inmates at FCCW." (*Id.* ¶ 169.) But it does not follow that Alridge "kn[ew] of and disregard[ed] an

---

[8] Fletcher also alleges, based on information and belief, that "many other inmates have filed PREA complaints" against both Hargrave and Daniels. (Second Am. Compl. ¶¶ 57, 59.) Even if knowledge of these PREA complaints could be imputed to Aldridge as warden, these allegations do not sufficiently allege that Aldridge had knowledge of excessive risk to Fletcher.

First, knowledge that Hargrave and Daniels had "a history of violence or had made threats" is not sufficient to allege deliberate indifference unless "[Aldridge] subjectively believed [the assailant inmates] posed a substantial risk of serious harm . . . ." *Strickland*, 638 F. App'x at 185 (4th Cir. 2015)). Knowledge of PREA violations by Hargrave and Daniels against other prisoners does not inherently put Aldridge on notice that there was an excessive risk to Fletcher, specifically. Indeed, Fletcher does not allege that she submitted grievances informing Aldridge of Hargrave and Daniels' attacks against her until after both the rape and the broken hand occurred. (*See* Second Am. Compl. ¶ 101.) To state a claim for deliberate indifference, Fletcher must allege that there was a known, excessive risk to *her*, specifically. *See Crosby v. Manis*, No. 7:23-cv-00124, 2025 WL 943661, at *5 (W.D. Va. Mar. 28, 2025) (holding that "Plaintiff cannot sustain a claim based only on [a supervisor's] position . . . and access to general knowledge of prison goings-on resulting from that position"); *Fishburne v. SC Dep't of Corr.*, No. 8:23-cv-5469, 2025 WL 581890, at *8 (D.S.C. Jan. 17, 2025), *adopted by* No. 8:23-cv-05469, 2025 WL 579990 (D.S.C. Feb. 21, 2025) ("Courts have found prison officials to be actually aware of a sufficiently substantial risk of assault where custodians know of threats to specific prisoners posed by a specific source, or place prisoners in the same cell as an inmate known to have violent propensities." (citation omitted).)

excessive risk to inmate health or safety" before her rape or broken hand. *Farmer*, 511 U.S. at 837; *cf. id.* at 842–43 (explaining that a trier of fact can conclude a defendant-official had actual knowledge of risk if the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, *and* the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." (emphasis added) (citation omitted)).

Because Fletcher fails to sufficiently allege Aldridge's knowledge of the risk before September 24 or any factual circumstances pointing to such knowledge, she cannot plausibly allege that Aldridge disregarded that risk. *See Koon v. N. Carolina*, 50 F.4th 398, 406 (4th Cir. 2022) ("Deliberate indifference requires a deliberate or conscious choice to ignore something. . . . An official must know of the dangers to federal rights and nonetheless disregard them." (cleaned up)).[9]

*ii. After September 24, 2023*

Fletcher alleges that Defendant Aldridge was aware of her assault, the existence of a keep separate order between herself and Hargrave and Daniels, and the failures to enforce that keep separate order by March 1, 2024, at the latest.[10] (*See* Second Am. Compl. ¶ 101.) She

---

[9] The same reasoning applies regarding Fletcher's allegations that Aldridge failed to maintain staff sufficient "in number and training . . . ," (Second Am. Compl. ¶ 189), and that he "maintained a system of review . . . which has failed to identify and/or correct" that insufficient staffing and training or to provide appropriate discipline and supervision, (*id.* ¶ 184). Since Aldridge cannot be deemed to have known about an excessive risk to Fletcher's health or safety, *see Farmer*, 511 U.S. at 837, his actions cannot be taken in disregard of that risk. *Koon*, 50 F.4th at 406.

[10] On March 1, 2024, Aldridge deemed Fletcher's written grievance from October 25, 2023 to be unfounded. (Second Am. Compl. ¶ 101.) Fletcher's grievance mentioned her prior assault by Hargrave. (*Id.*) In his response, Aldridge noted the existence of a keep separate order. (*Id.*) Though it is likely that this complaint was elevated from the Institutional Ombudsman to Defendant Aldridge sometime before Aldridge's response on March 1, 2024, that date is not ascertainable from the record.

alleges that Defendant Aldridge knew of the injuries she suffered from continuing to encounter and face retaliation from Hargrave and Daniels by March 24, 2024 at the latest.[11] (*Id.* ¶¶ 107, 201; Dkt. 32-9 at 42–43; Dkt. 32-7 at 4–5.)

Operating Procedure 830.6 requires that "[i]f a keep separate claim was initiated due to an assault, staff should recommend the aggressor for transfer" and states that inmates on keep-separate status should "always" be separated. (Dkt. 32-6 at 6.) Despite repeatedly receiving evidence that the order was not being enforced, at the risk of serious emotional harm to Fletcher, (*see* Second Am. Compl. ¶¶ 101, 107, 113, 115, 120–21, 130), Aldridge took no further action to separate Fletcher from Hargrave and Daniels, (*see, e.g.*, *id.* ¶¶ 101, 107, 113, 115); stated that a keep separate order was in place without correcting the deficiencies in the enforcement of the order, (*id.* ¶¶ 101, 107); and inappropriately provided a disposition on one of Fletcher's PREA grievances, (*id.* ¶¶ 130–31).

As explained in the court's June 8, 2026 opinion, § 1983 does not create a cause of action for a prison administrator's denial of grievances or failure to comply with prison policy. (Dkt. 30 at 18); *see Brown v. Va. Dep't Corr.*, No. 6:07-cv-00033, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009); *King*, 76 F.4th at 267; *Chatman v. Clarke*, No. 7:16-cv-00509, 2016 WL 7480426, at *3 (W.D. Va. Dec. 29, 2016). But these allegations can support a deliberate indifference claim by "demonstrating [Aldridge] had notice, available protective mechanisms,

[11] On November 14, 2023, Fletcher submitted a written complaint detailing verbal harassment by Hargrave and expressing a desire "to not be antagonized and harassed" by her rapist. (Second Am. Compl. ¶ 107.) Making all reasonable inferences in favor of Fletcher, this complaint (and others of which Aldridge plausibly had constructive notice, (*see id.* ¶ 99)) plausibly made Aldridge aware that Fletcher faced a risk of serious emotional injury in light of the history between her and Hargrave. Aldridge's response to the November 14 grievance came on March 21, 2024. (Dkt. 32-9 at 42–43.) Though it is likely that this complaint was elevated to Aldridge sometime before the date of his response, that date is not ascertainable from the record.

and repeated opportunities to act but disregarded the same." (Pl.'s Resp. at 26); *see, e.g.*, *Young*, 2012 WL 621358, at *5 (explaining that a prison official may be liable under § 1983 for failing to respond to constitutional violations that come to his attention during the grievance process).

Accordingly, Fletcher has plausibly alleged that Fletcher was deliberately indifferent to a known, serious risk of harm against her during the period after September 24, 2023. *See Scott,* 2012 WL 6151967, at *5 ("The receipt of letters by prison officials may be evidence of personal knowledge of unconstitutional conditions, particularly where the harm continues over a period of time." (cleaned up)); *Cantrell*, 553 F. Supp. 3d at 303 (noting that even if a defendant took some action, "[a] defendant's inadequate response . . . can still support a finding of deliberate indifference").

2. Supervisory Liability

Fletcher also alleges that Aldridge is liable in a supervisory capacity. (*See, e.g.*, Second Am. Compl. ¶¶ 172–174, 184, 202, 212.) Rather than *respondeat superior*, supervisory liability under § 1983 relies upon a showing "that the prisoners face a pervasive and unreasonable risk of harm from some specified source, [and] . . . that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (citation omitted) (cleaned up). This theory of liability constitutes "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* at 372 (citation omitted); see also *Younger v. Crowder*, 79 F.4th

373, 381 n.12 (4th Cir. 2023) (explaining that the term "supervisory liability" is "a misnomer" because liability under § 1983 is limited to a state official's own misconduct).

To successfully allege supervisory liability under § 1983, Fletcher must allege (1) "that [Aldridge] had actual or constructive knowledge that [his] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like [Fletcher]"; (2) "that [Aldridge's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "that there was an affirmative causal link between [Aldridge's] inaction and the particular constitutional injury suffered by [Fletcher]." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (cleaned up); see *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

To satisfy prong one, Fletcher must allege that Aldridge had actual or constructive knowledge of unconstitutional conduct by either Barbour or Jackson, since she does not plausibly allege that any other subordinate has engaged in conduct which risked constitutional injury to her. *English v. Murphy*, No. 1:09-cv-866, 2013 WL 1465321, at *7 (M.D.N.C. Apr. 11, 2013), *adopted by* No. 1:09-cv-866, 2015 WL 1505668 (M.D.N.C. Mar. 31, 2015) (explaining that the "absence of any underlying constitutional injury" defeats a theory of supervisory liability).

Fletcher does not allege that Aldridge had any knowledge, actual or constructive, of Barbour's failure to act on Fletcher's report of rape before her hand was broken. (*See* Second Am. Compl. ¶ 76); *cf. Addison v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. CV 25-846, 2026 WL 795610, at *16 (D. Md. Mar. 20, 2026) (finding implausible a claim of supervisory liability

that was "couched in conclusory language [ and] devoid of any factual detail to show that the conduct is widespread . . . [or] that the Warden knew or had constructive knowledge that the correctional officers were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" (cleaned up)). Further, a plaintiff seeking to allege deliberate indifference "ordinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." *Shaw*, 13 F.3d at 799 (cleaned up); *Addison*, 2026 WL 795610, at *15 ("Establishing a 'pervasive' and 'unreasonable' risk of harm requires allegations that the [unconstitutional] conduct is widespread, or at least has been used on several different occasions. . . ." (cleaned up)).

Next, to state a claim for supervisory liability against Aldridge based on Jackson's alleged deliberate indifference in the period after September 24, 2023, Fletcher must allege that Aldridge was aware of Jackson's deliberately indifferent conduct towards Fletcher. Aldridge responded to complaints that Jackson had already reviewed on at least four occasions. (*See* Second Am. Compl. ¶¶ 101, 113, 121, 128, 130.) Making all reasonable inferences in favor of Fletcher, then, Aldridge can be assumed to have known of Jackson's alleged deliberate indifference as early as February 27, 2024.[12] *See Shaw*, 13 F.3d at 799–800 (explaining that establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct has "at least been used on several different occasions" and finding that a supervisor's knowledge of "at least three incidents" of a subordinate's unconstitutional conduct sufficed).

[12] This is the date on which Defendant Alridge responded to the third complaint, which Defendant Jackson had already reviewed. (Second Am. Compl ¶ 121; Dkt. 32-9 at 2.)

Next, Fletcher must allege "that [Aldridge's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices" and that Aldridge's response caused the harm Fletcher suffered. *Wilkins*, 751 F.3d at 226 (cleaned up); *see also Shaw*, 13 F.3d at 799. Fletcher alleges that "Defendant Aldridge has . . . failed to identify and/or correct the insufficient staffing and training of his agents and employees." (Second Am. Compl. ¶ 184.) As a result, Fletcher alleges, "agents and employees of FCCW . . . believe there exists no meaningful duty to properly supervise and protect inmates from unreasonable risks of substantial harm," and therefore, they "ignored the concerns of [Fletcher] regarding [her] safety." (*Id.* at 185.) Fletcher does not allege that Aldridge failed to reprimand or correct Jackson, specifically. That said, the grievances to which both Jackson and Aldridge responded demonstrate that Aldridge repeatedly did not disturb Jackson's disposition or engage with it all, rather than requiring that Jackson comply with relevant VDOC policies. (*See id.* ¶¶ 101, 113, 121, 128, 130); *cf. Wilkins*, 751 F.3d at 227 (explaining the potential supervisory liability of a supervisor who knows of a sufficiently widespread problem "but d[oes] nothing to remedy the situation"). The facts pled thus plausibly allege that Aldridge's response was so inadequate as to constitute tacit authorization of Jackson's behavior.

Finally, Fletcher must allege that Aldridge's inaction caused her injury. "[T]he causal link in § 1983 cases is analogous to proximate cause." *Shaw*, 13 F.3d at 800. "In other words, [Aldridge] is liable for the natural consequences of his actions." *Id.* (cleaned up). The trauma and PTSD Fletcher suffered was a natural and probable consequence of Aldridge's failure to

correct or overrule Jackson's alleged deliberate indifference. *See id.* 13 at 798 (noting that supervisory liability "ultimately is determined by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked" (cleaned up)). Thus, Fletcher plausibly alleges a supervisory liability claim against Aldridge for the period after September 24, 2023 as to Jackson's alleged deliberate indifference towards Fletcher.

3. <u>Failure to Train</u>

Finally, Fletcher claims that Aldridge "failed to properly train FCCW employees," including Defendants Jackson, Jamerson, Hucks, and Barbour. (Second Am. Compl. ¶¶ 204–06.) To state a claim for failure to train, a plaintiff must show: "(1) that the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) that the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) that this failure to train actually caused the subordinates to violate the plaintiff's rights." *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014) (cleaned up).

Fletcher's second amended complaint adds allegations that Defendant Aldridge failed to train Defendants Jackson, Jamerson, Hucks, and Barbour, specifically. (Second Am. Compl. ¶¶ 204–5.) She also adds to the list of topics about which she alleges Aldridge failed

to train FCCW agents and employees. (*Compare* Second. Am. Compl. ¶ 206 *with* First Am. Compl. ¶ 154.)

As the court concluded *supra*, Fletcher does not sufficiently allege that any of the Defendant Officials besides Barbour and Jackson violated her constitutional rights. Thus, only allegations that Aldridge had failed to train Barbour or Jackson could support a claim that "[Aldridge] failed to train properly the subordinates[,] thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact." *Gallimore*, 38 F. Supp. 3d at 726 (cleaned up).

Fletcher alleges that "Defendant Aldridge failed to properly train FCCW employees, namely Defendant Barbour, regarding mandatory reporting of a rape . . . and other standards related to sexual abuse and harassment." (Second Am. Compl. ¶ 205.) She also alleges that "Defendant Aldridge failed to properly train . . . Defendant[] Jackson . . . regarding gang-related retaliation, instituting keep separate orders between inmates following a physical attack and repetitive threats and harassment, and other reasonable measures to protect inmates at FCCW." (*Id.* ¶ 204). These allegations, with no factual support, are conclusory.

Fletcher also fails to adequately allege causation in relation to either subordinate. Fletcher does not plausibly allege that Aldridge's failure to train Barbour led to Barbour's response to Fletcher's report of her rape. Nor does she plausibly allege that Aldridge's failure to train Jackson led to Jackson's alleged deliberate indifference towards Fletcher. Fletcher alleges generally that "[a]s a direct and proximate result of Defendant Aldridge's failures[,] . . . Fletcher suffered constitutional injury," including "continued physical and mental injury due

to ongoing retaliatory measures by Hargrave and Daniels." (*Id.* ¶ 225.) However, her second amended complaint does not provide factual support for this assertion. Instead, this allegation amounts to a conclusion regarding an element of the failure to train claim, and the court need not defer to Fletcher's conclusions of law. *Edwards,* 178 F.3d at 244. As a result, Fletcher's failure to train claim fails.

## IV. Conclusion

For all these reasons, the court will grant the Defendants' motion, (Dkt. 35), as to Defendants Hucks, Thomas, Elliott, Woodson, and Jamerson as to Count I. Count I remains pending against Defendant Barbour, who did not join the Defendants' motion to dismiss, as well as Defendant Jackson for the period following September 24, 2023. As to Counts II and III, the court will grant the Defendants' motion to dismiss Fletcher's failure to train claims against Defendant Aldridge but will deny the motion as to claims for direct and supervisory liability against him for the period after September 24, 2023. Fletcher's failure to train claims will be dismissed without prejudice. Fletcher's claims against Defendant Aldridge for direct and supervisory liability for the period after September 24, 2023 remain pending.

An appropriate Order will issue.

**ENTERED** this 9th day of November, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE